CUNNINGHAM ET AL. *v.* WARNER GEAR COMPANY.

[No. 15,464.   Filed December 20, 1935.]

*Clarence G. Higi* and *F. Clayton Mansfield,* for appellants.

*Herman L. McCray, Edward J. Boleman, Burrell Wright* and *Jacob S. White,* for appellee.

KIME, J.—Appellants appeal to this court from an award of the full Industrial Board of Indiana, a part of which award reads as follows:

"And the full Industrial Board having heard the argument of counsel, having reviewed the evidence in the original hearing and being duly advised therein, now finds that on June 28, 1934, one Pearly Cunningham was in the employ of the defendant at an average weekly wage of $24.96.

"It is further found that on June 28, 1934, the said Pearly Cunningham died.

"It is further found by the full Industrial Board of Indiana that the death of the said Pearly Cunningham was caused by heat prostration.

"It is further found by the full Industrial Board, by a majority of its members, that the death of said Pearly Cunningham was not due to any accidental injury arising out of or in the course of his employment with the defendant.

### ORDER.

"It is therefore considered and ordered by the full Industrial Board of Indiana, by a majority of its members, that the plaintiffs shall take nothing by their complaint herein and that they shall pay the costs of this proceeding."

The error assigned is that the award of the full Industrial Board of Indiana is contrary to law.

The evidence discloses that appellants' decedent died as the result of heat prostration while in the employ of appellee; that he was forty-three years of age at the time of his death; that he did not use alcoholic beverages or tobacco in any form and had no organic disease. That for several years prior to his death he had been in good health and had no sickness except occasional common colds, mumps in 1928, and a slight illness on the Monday evening preceding the Thursday evening on which he died. That he worked from 4:00 o'clock P. M. until midnight and that for several days prior to his death he did no work except at appellee's factory, where he was employed in the heat treat department, located in a building made of brick and glass. Part of the heat treating operation consisted of immersing automobile gears in a cyanide solution heated to a high temperature, leaving the gears therein until heated to a red hot state, then removing the gears and placing them in a receptacle containing oil. The cyanide was heated in pots set in furnaces in the heat treating department. These pots were about three feet long, two and one-half feet wide and one and one-half feet deep. Four of these pots were known as the automatic pots and were arranged in a row along the south wall of the building. They were enclosed on all sides, except as to a hole big enough to put the gears into the pots. On these four pots one Williamson worked. The pots at which decedent worked were arranged in two rows, two pots to the row, set in furnaces placed to the north from the automatic pots. The pots at which decedent worked were enclosed on one side and at the ends, and above them was a hood in which was an opening through which the fumes were taken out by suction. One side of each of these sets of two pots was entirely open, being

the side which the decedent approached for the purpose of immersing and later removing the gears from the cyanide. Of these two sets one opened to the south toward the automatic pots operated by Williamson, the other set opened to the north. There was a space of eight or ten feet between the set opening to the south and the automatic pots operated by Williamson.

At a distance of about eight feet from the pots was a unit for forcing air into the heat treating department. It was the custom of the operators to have this incoming air and current thereof trained at and toward the open pots, and the current was noticeable only when one was in front of the open pots.

The cyanide solution in which the gears were dipped was heated to a red hot liquid state of which the temperature was from 1200 to 1600 degrees, and the receptacles containing the oil were set a few feet from the pots. Decedent, on the day of his death, was operating with three of the open pots. The distance between the two sets of pots at which decedent worked is not clearly disclosed by the evidence but it is shown that his work kept him, at all times, within a distance not greater than twenty feet from the open pots.

The precise manner in which decedent performed his work was as follows: Automobile gears, each weighing from 1 to 1½ pounds, were placed at a point about twenty feet from the open pots. Four of these gears were wired together at a time by the decedent and by him carrid with a five-foot iron rod constructed so that the hook on the end thereof would pass beneath the wires fastening the gears together. With this rod the decedent carried the gears to the open pots, placed them in the cyanide, and later, by means of the rod, removed them from the cyanide and placed them in the oil receptacle. In doing this operation, the decedent came in close contact with the open cyanide pots, his

hands being almost directly over the edge thereof. The rods with which he worked became heated and it was necessary for him to wear gloves to protect his hands from the heat. In immersing and removing the gears from the cyanide, the decedent was required to face the open pots. Persons passing in the aisles or space near the open pots could feel the heat emanating therefrom.

On the Monday evening preceding his death, the decedent became somewhat ill and went home from his work. On Tuesday, Wednesday, and Thursday he went to work as usual. On Thursday, June 28, 1934, the decedent drove from his home to the appellant's factory and worked from 4:00 o'clock P. M. until about the time of his death, sometime between 7:00 and 8:00 o'clock P. M. He did not eat at the factory after going to work except some time before 7:00 o'clock P. M. he was seen eating or sucking a lemon. A little later, decedent looked like he was sick. He was sitting down, about ten feet away from the pots. He had a pale color, was not sweating, his clothes were dry except under his suspenders. About 7:50 o'clock P. M. he was found lying on the floor with his feet toward and about six feet from the south tier of pots on which he worked, and the rest of his body extending away from the pots. Workmen who approached him raised him up, he seemed to gasp for his breath, but was not observed to breathe any more. He was carried outside and placed on a lawn for about five minutes and was then moved to the first-aid room, about one-half square from the lawn, where first-aid was administered. About fifteen minutes after he was taken to the first-aid room the factory doctor arrived and found that the decedent was dead at the time.

The weather was warm on the day of decedent's death and had been for some preceding days. Temperatures on the date of decedent's death taken in the standard weather bureau observation thermometer shelter in the

shade, as specified by the weather bureau, were 99 degrees at 4:00 o'clock P. M.; 95 degrees at 5:00 o'clock P. M.; 94 degrees at 6:00 o'clock P. M.; 88 degrees at 7:00 o'clock P. M.; and 86 degrees at 8:00 o'clock P. M. These temperatures were taken 75 feet above street level and the expert testified that the heat would be greater on the ground level.

It was hotter near the pots, where the decedent worked, than it was outside the factory building.

One doctor examined decedent about a year previous to his death and found the decedent, at that time, in good health and not suffering from disease or any organic trouble. Another doctor examined decedent about three months before his death and found no organic disease and found decedent in good health, except suffering from a cold. Another doctor, in answer to a hypothetical question based upon facts proved at the hearing, testified that, in his opinion, the decedent's death was caused by heat exhaustion due to the heat, as it was in the factory at the place in which he was working. Another doctor, in answer to a hypothetical question based upon facts proved at the hearing, testified that in his opinion the decedent's death was caused by heat exhaustion from the heat to which decedent was subjected in the factory. This evidence was not contradicted.

The only question presented here is, was the death of the decedent due to any accidental injury arising out of or in the course of his employment with the defendant?

"An accident is said to arise 'out of' the employment when there is apparent to the rational mind, upon a consideration of all of the circumstances, a causal connection between the conditions under which the work was required to be performed and the resulting injury." *Haskell, etc., Car Co.* v. *Brown*

(1917), 67 Ind. App. 178, 117 N. E. 55. An untoward event, an unlooked for mishap, which is not expected or designed, is the definition of the word "accident," as used in our compensation act. *Townsend & Freeman Co.* v. *Taggart* (1924), 81 Ind. App. 610, 144 N. E. 556; *General Printing Company* v. *Umback* (1935), 100 Ind. App. 285, 195 N. E. 281; *Chapman-Price Steel Co.* v. *Bertels* (1931), 92 Ind. App. 634, 177 N. E. 76.

The undisputed evidence, pertinent to a decision here, shows that decedent was forty-three years of age and in good health. That it was extremely hot in the city of Muncie all week, including the evening when decedent died; that it was considerably warmer where decedent worked than outside of the factory building and that the pots he worked with were open on one side. That one passing the place where decedent was working could feel the heat emanating therefrom. The doctors who testified as to the cause of decedent's death both said that decedent died of heat exhaustion from the heat he was subjected to at the place where he was working.

There is no question as to decedent's death being due to heat prostration. Heat prostration and sun stroke are one and the same thing. "Sunstroke," says Encyclopedia Americana "is a prostration due to exposure to intense external heat. Such exposure may be due to the direct or indirect rays of the tropical sun or to the excessive heat of an engine room. In either case heat and physical exertion combine to bring about the results. A high degree of humidity of the atmosphere is one of the most important features, since this hinders free evaporation from the body." In Webster's New International Dictionary under "sunstroke" is a reference to "heatstroke" which is defined, among other things, as "A depression of the vital powers, due to exposure to excessive heat and manifesting itself as prostration with

syncope, etc. (heat prostration), as prostration with insensibility, fever, etc. (true sunstroke) . . ."

In the case of *State ex rel. Rau* v. *District Court* (1917), 138 Minn. 250, 164 N. W. 916, the decedent therein died of sunstroke in the course of his employment. It appears that he was a manual laborer employed by the city of St. Paul on its streets; that he was working in the open with no protection from the sun; that the street was sandy; that it rained the night before and the sand was moist. During the early part of the afternoon he and his fellow workers rested and resumed work at 3:00 o'clock P. M. Shortly thereafter decedent staggered, a workman went to his assistance; the foreman gave him a drink of water and took him to a hospital. He died a few days after being released therefrom and the trial court found that he had died from sunstroke. The Supreme Court in its opinion said:

"It is undisputed that the day was extremely hot. The men had rested for three-quarters of an hour in the shade and returned to their labor. Decedent was at work near the middle of the street, when, all at once, he was seen to stagger. He had been overcome; he suffered a sunstroke. . . . The intense heat of the sun, associated with the humidity of the atmosphere emanating from the wet sand . . . worked upon decedent so as to cause his injury and death. . . .

"Where the work and the conditions of the place where it is carried on expose the employee to the happening of an event causing the accident, *there is no longer a risk to which all are exposed,* and the result is an accident arising out of the employment." (Our italics.)

See also *Townsend and Freeman* v. *Taggart, supra; Chapman-Price Steel Co.* v. *Bertels, supra; Young* v. *Western Furniture Co.* (1917), 101 Neb. 696, 164 N. W. 712, and *Walsh* v. *River Spinning Co.* (1918), 41 R. I. 490, 103 Atl. 1025, in which last case the court said:

"When, however, a workman has been injured in the course of his employment by reason of being subjected to certain conditions incident thereto and not common to the neighborhood or to the whole community, then without question the injury was received in the course of his employment and arose out of it."

and then quotes with approval from *Ismay, Imrie & Co. v. Williamson* (1908), 1 B. W. C. C. 232, which arose from an award of compensation to a widow on account of the death of her husband, from heatstroke while working in the stokehole of a ship, as follows: "In my view this man died from an accident. What killed him was heatstroke, coming suddenly and unexpectedly upon him while at work. Such a stroke is an unusual effect of a known cause, often, no doubt, threatened, but generally averted by precautions, which experience in this instance had not taught. *It was an unlooked for mishap in the course of the employment.* In common language, it was a case of accidental death." (Our italics.) That sunstroke or heat prostration may be an accident and that the heat prostration suffered by decedent herein was an accident see *Ahern* v. *Spier et al.* (1918), 93 Conn. 151, 105 Atl. 340; *Larke* v. *Hancock Mutual Life Ins. Co.* (1915), 90 Conn. 303, 97 Atl. 320, L. R. A. 1916E, 584; *Cunningham* v. *Donovan* (1919), 93 Conn. 313, 105 Atl. 622, and *Lane* v. *Horn and Hardart Baking Co.* (1918), 261 Pa. 329, 104 Atl. 615.

In the case of *Townsend & Freeman Co.* v. *Taggart, supra,* appellee was in the employ of appellant and his work was to haul logs to a saw mill belonging to appellant. Appellee and a fellow worker, at the direction of appellant, left Nashville to haul logs from a place five miles distant, using two wagons, one with a four-horse team and the other with a two-horse team. They assisted each other in loading the wagons, when they arrived at the place where the logs were located, appellee doing most of the

work. After the wagons were loaded the two men started for the mill, with the appellee having charge of the four-horse team. This was about 9:30 o'clock A. M. The road used was graveled and appellee rode one of the horses part of the time. One hundred degrees Fahrenheit was the maximum temperature of that day. The sun was shining brightly and appellee had no protection from the sun. The teams moved slowly, and arrived at the mill about noon. On dismounting one of the horses, after riding it to a nearby barn, appellee suffered a sunstroke, which resulted in permanent disability. From an award of compensation to appellee, appellant appealed. Pertinent parts of the court's opinion are as follows:

"The only question presented is whether, under the facts stated, and which were found by the Industrial Board, appellee's injury was an accident arising out of his employment. The word accident in §2 of the Workmen's Compensation Act . . . is used in its popular sense, and means any mishap or untoward event not expected or designed. . . . Within the meaning of this definition, a sunstroke may be, and the sunstroke suffered by appellee was, an accidental injury. . . .

"It is earnestly contended by appellant that even if the sunstroke suffered by appellee was an accidental injury, the award cannot be upheld for the reason that there is no evidence to support the finding of the board that it arose out of his employment. We cannot concur in this view. . . .

"We are therefore constrained to hold that there is competent evidence tending to prove that the employment of the appellee at the time he received the sunstroke was such as to expose him to a hazard beyond that of the general public, and that his disability which resulted from the sunstroke was due to an accident arising out of his employment."

In the *Chapman-Price* v. *Bertels* case, *supra,* the workman was engaged in rolling steel in a mill where the heat was extreme, both due to the furnaces near which he was working and the temperature of the day, it being

in June, 1928. While so working he became exhausted due to the heat. One of the doctors testified that his condition was the result of "being overheated caused by being subjected to heat continuously." Another doctor testified that he found the workman suffering from excessive heat. The court in this case held that the word accident meant "any mishap or untoward event not expected or designed" and that such overheating was an accident within the meaning of the act.

The heat emanating from the pots at which decedent was working exposed him to a hazard beyond that of the other employees, therefore, the resulting death from heat prostration will be regarded as due to an accident arising out of the employment. *Townsend and Freeman Company* v. *Taggart, supra,* and cases there cited. See also *Chapman-Price* v. *Bertels, supra; United Paperboard Co.* v. *Lewis* (1917), 65 Ind. App. 356, 117 N. E. 276, and cases there cited. *State ex rel. Rau* v. *District Court, supra,* and *Walsh* v. *River Spinning Co., supra.*

There can be but one inference drawn from the evidence herein and that is that decedent died as the result of an accidental injury arising out of his employment, as the accident occurred in the course of his employment and as a result of it. Hence the finding of the board that decedent's death was not due to any accidental injury arising out of or in the course of his employment with the appellee is not sustained by any of the evidence or any legitimate inference that can be drawn therefrom.

The award of the Industrial Board is reversed with instructions to the board to enter an award in favor of the appellants.

Dudine, J., concurs on authority of *Chapman-Price* v. *Bertels, supra.*